In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-3562

HOOSIER CARE, INC.,

*Plaintiff-Appellant*,

*v.*

MICHAEL CHERTOFF, Secretary of Homeland Security, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 05–2050—**Michael P. McCuskey**, *Chief Judge*.

———————

ARGUED MARCH 28, 2007—DECIDED APRIL 11, 2007

———————

Before POSNER, ROVNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff, Hoosier Care, operates a residential care facility for profoundly disabled children and adults. Most of these unfortunates have a mental age of less than 18 months and cannot walk or talk or perform even the simplest daily living task without assistance. The plaintiff wanted to hire two Filipinos, neither an American citizen, to be members of the staff that takes care of the residents ("Developmental Disability Specialists"). To obtain immigrant visas for them, the plaintiff had first to obtain an alien labor certification

from the Department of Labor. It submitted an application in which it stated that the minimum education, training, or experience required for the position was a bachelor's degree in any field. One of the two aliens whom it wants to hire has a bachelor's degree in agriculture; the other has one in maritime transportation. Letters filed in support of the application, written by members of the plaintiff's staff and by outside experts, explained that college graduates, regardless of their major, do better working with the residents of the plaintiff's facility than less-well-educated persons do.

The Department of Labor granted the certification. The plaintiff had then to petition U.S. Citizenship and Immigration Services, an agency of the Department of Homeland Security, to classify the two aliens as eligible for "employer-based" immigration. DHS rejected the petition and the plaintiff, Hoosier Care, brought this suit to challenge the rejection, and lost in the district court.

The appeal requires us to interpret two statutory provisions and two provisions of a regulation promulgated by DHS. Section 1182(a)(5)(A)(i) of Title 8 forbids an alien's entering the United States "for the purpose of performing skilled or unskilled labor" unless the Department of Labor certifies that there is a shortage of American workers able and willing to perform the labor in question and that allowing an alien to perform it will not harm American workers. DHS is then responsible for determining whether, in the case of skilled labor, a specific alien is "capable . . . of performing skilled labor (requiring at least 2 years training or experience)." 8 U.S.C. § 1153(b)(3)(A)(i). It is these provisions that create the two-stage procedure that Hoosier Care followed, striking out at the second stage.

DHS interprets these provisions as creating the following division of responsibilities between it and the Labor Department: the Labor Department determines whether there is a labor shortage that could be alleviated by hiring aliens without thereby hurting American workers, and DHS then decides whether the alien should be permitted to be hired to help meet the shortage. In the case of skilled labor, DHS's regulation repeats the statutory definition of its responsibility (determining whether the alien is "capable . . . of performing skilled labor (requiring at least 2 years training or experience)") but adds that "relevant post-secondary education may be considered as training for purposes of this provision." 8 C.F.R. § 204.5(*l*)(2). In the case at hand, DHS's Administrative Appeals Office ruled that the aliens' college majors were not "relevant" post-secondary education because neither agriculture nor transportation is a field of knowledge that relates to the care of severely retarded persons. "Relevant," the Office suggested, would be majors in such fields as psychology and education (in which event two years of college would suffice, not the four ordinarily required to obtain a bachelor's degree).

We cannot say that this interpretation of "relevant post-secondary education" is unreasonable, and ordinarily that would be the end of our inquiry. But there is more to the regulation than the subsection we've quoted. A subsection not cited by DHS, entitled "differentiating between skilled and other workers," states that "the determination of whether a worker is a skilled or other worker will be based on the requirements of training and/or experience placed on the job by the prospective employer, as certified by the Department of Labor." 8 C.F.R. § 204.5(*l*)(4). In other words, the determination of what *kind* of training

is required to classify an alien as a "skilled" worker is made by the Labor Department upon consideration of the submission by the alien's prospective employer. That department certifies the requirements for a job and the Department of Homeland Security then determines whether the alien whom the employer wants to hire satisfies those requirements—that is, whether he *has* the training that the Department of Labor believes is required for the job. Thus, that department determines whether a college education regardless of major qualifies an alien as a skilled worker for Hoosier Care (that is, whether such an education is "relevant post-secondary education" within the meaning of subsection (*l*)(2)), and DHS then determines whether in fact each of the two aliens whom Hoosier Care wants to hire has a bachelor's degree.

This understanding of the respective responsibilities of the two departments is supported by the processing of Hoosier Care's application to the Department of Labor. The application lists among the requirements for the job a bachelor's degree in any field. By granting the application and issuing the certification, the department accepted, presumably after reviewing the application, Hoosier Care's specification of requirements for the job. Suppose the job had been raking leaves and the application had listed as a requirement that the employee have a bachelor's degree in religious studies, because the employer knew that no American with such a degree would apply for such a job but that unemployed college graduates in Somalia who had majored in religious studies would. Or suppose Hoosier Care had specified that only applicants for employment who speak Tagalog (one of the major languages of the Philippines) would be considered for the job. In both these hypothetical cases the employer would have gerryman-

dered the requirements of the job in order to ensure that no Americans would apply, so that he could hire an alien at a lower wage instead. The Department of Labor, unless asleep at the switch, would not approve such an application. This is apparent from the instructions that it gives employers for preparing applications for alien labor certifications. The instructions state: "Job requirements must adhere to what is customarily required for the occupation in the U.S. *and may not be tailored to the worker's qualifications.* In addition, the employer shall document that the job opportunity has been and is being described *without unduly restrictive job requirements*, unless adequately documented as arising from business necessity." U.S. Dept. of Labor, Employment & Training Administration, "Permanent Labor Certification," Mar. 7, 2007, www.foreignlaborcert.doleta.gov/perm.cfm (visited Mar. 28, 2007) (emphasis added). "Tailored" or "unduly restricted" job requirements would be requirements designed to limit the applicant pool to aliens. There is no suggestion of such monkeyshines here.

Hoosier Care cited subsection (*l*)(4) of the regulation and pointed out that it imposes on the Labor Department, not the Department of Homeland Security, the duty of determining "the least restrictive job requirements for the position" that the employer seeks to fill with an alien worker. It quoted the passage in *Grace Korean United Methodist Church v. Chertoff*, 437 F. Supp. 2d 1174, 1179 (D. Ore. 2005), in which the court explained that the employer (per (*l*(4)) establishes "the requirements of training and/or experience placed on the job by the prospective employer, as certified by the Department of Labor," while DHS "looks to education and experience requirements in the labor certification to determine

whether the applicant falls within the skilled worker or professional classification." On DHS's contrary view, pressed on us in this case, DHS second-guesses the Labor Department's evaluation of job requirements. In turning down Hoosier Care's application DHS complained that the applicant hadn't indicated "what type of degrees the persons currently filling the position [that the two Filipino college graduates would fill] possess, or any indicators of the success of those persons such as evaluations, retention rates, etc." That is an inquiry into the training requirements for the positions, which is a matter that the regulation—DHS's own regulation—confides to the Department of Labor.

And not just the regulation—the statute as well. The Labor Department cannot discharge its statutory responsibility to determine the effect on American workers of allowing an alien to become a permanent resident of the United States without making sure that the prospective employer has not defined the qualifications for the job in such a way as to exclude American workers for reasons unrelated to job qualifications, as in our leaf-raking and Tagalog examples. So what we have described as DHS's "delegating" this responsibility to the Department of Labor in the regulation is actually recognition of the location of a responsibility implicit in the Labor Department's statutory mandate. In any event, the regulation is clear and its validity unchallenged.

DHS's brief does not cite subsection (*l*)(4). It is apparent from the cases it does cite that the briefwriter didn't understand the difference between the requirements for a job and whether a given individual satisfies those requirements, and thus the difference between requiring a bachelor's degree for a particular type of job and deter-

mining whether a given individual has a bachelor's degree. The cases that DHS cites deal with the latter issue, not the former. One of them, indeed, expressly rejects DHS's position: *Madany v. Smith*, 696 F.2d 1008, 1015 (D.C. Cir. 1983), holds that "DOL [the Department of Labor] bears the authority for setting the *content* of the labor certification and [DHS's predecessor, the Immigration and Naturalization Service] cannot impose job qualifications beyond those contemplated therein" (emphasis in original)—which is what DHS did in this case.

Several cases describe the Labor Department's responsibility in employment-based immigration as limited to "determining the availability of suitable American workers for a job and the impact of alien employment upon the domestic labor market." *K.R.K. Irvine, Inc. v. Landon*, 699 F.2d 1006, 1008 (9th Cir. 1983) (per curiam); see also *Black Construction Corp. v. INS*, 746 F.2d 503, 504 (9th Cir. 1984) (per curiam); *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman*, 736 F.2d 1305, 1309 (9th Cir. 1984). The brief for the Department of Homeland Security fastens on this language, which paraphrases the statute, but misses the force of "suitable." Suitable American workers to take care of residents of Hoosier Care's facility would not have to have a degree in religious studies or speak Tagalog, but they would have to have a bachelor's degree in any field. So, at least, the Department of Labor has determined in the exercise of its responsibility to make sure employers don't jigger their job requirements to exclude willing and able ("suitable") American workers.

The court in *K.R.K Irvine* pointed out that the responsibility of the Immigration and Naturalization Service in regard to employer-based immigration was (and the responsibility of its successor, the Department of Home-

land Security, is) limited to "determining if the alien is qualified for the job." *K.R.K. Irvine, Inc. v. Landon, supra*, 699 F.2d at 1008. And *Tongatapu Woodcraft Hawaii, Ltd. v. Feldman, supra*, 736 F.2d at 1309, says it's "whether the alien is in fact qualified to fill the certified job offer." Those are different inquiries from whether the qualifications set by the employer are proper, which is the responsibility of the Labor Department.

We do not know how closely the Labor Department examines the suitability of the job requirements specified in an employer's application for an alien labor certification. But the Department of Homeland Security does not argue that in conducting such an investigation in this case it was simply doing the Labor Department's work for it. If it wants to do that it will have to change its regulation and probably also persuade Congress to change the statute.

The judgment of the district court is reversed and the matter returned to the Department of Homeland Security for further proceedings consistent with this opinion.

REVERSED WITH INSTRUCTIONS.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*